# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-25-00505-CV

**The Seely Group, LLC; Dallas Seely; and Amy Seely, Appellants**

**v.**

**David James Martin a/k/a David James, Appellee**

---

### FROM THE 200TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-23-001265, THE HONORABLE MAYA GUERRA GAMBLE, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

The Seely Group, LLC; Dallas Seely; and Amy Seely appeal the trial court's judgment following a bench trial in this dispute between a real-estate agent and his former agency. We reverse the judgment holding Dallas individually liable and reform the judgment as to the damages award conditioned on Martin filing a remittitur within thirty days of the date of this opinion. We otherwise affirm.

## BACKGROUND

David James Martin began his career in the military and served as an intelligence analyst in the Army. After leaving the Army, Martin worked in personal fitness and eventually opened about four gyms in California. In 2020, Martin and his family decided to move to Texas and "slow down a bit" to spend more time with family. He got his Texas real-estate license in October 2021 as a way "to make a good amount of money with the sales experience that I had

already" and have the flexibility to be more involved in his son's life. Martin initially worked with his wife's cousin "to learn the basics of the industry" before he "felt the need to join one of the best brokerages" where he could "learn the most." In February 2022, Martin joined the Seely Group, where he "was promised high-level superior training by superior agents," even though "the commission split was the lowest in the industry" at 60 percent to the agency and 40 percent to him, from which additional fees were withdrawn to pay the Seely Group's then-broker, Keller Williams Expansion Network.

The Seely Group is an Austin-based real estate agency owned by husband-and-wife team Dallas and Amy Seely. Dallas is the Seely Group's CEO, as well as a real-estate agent, and Amy is the Seely Group's current sponsoring broker. Dallas described their agency as "top .1 percent in the marketplace." Because real estate is the "highest failure rate sales industry," Dallas testified that "we wanted to give every single opportunity to anyone who would partner with us to be successful in real estate," so "I made a decision early on to invest hundreds of thousands of dollars into outside industry experts," offered "on top of all the internal training that they got from our history of success." Dallas testified that this training included a "90 days to success program," two outside sales coaches, and "access to mentorship and public speakers." Dallas testified that "the reason people join my company is me, is the training and the things I taught them and the internal and all the documents, the scripts, the recordings, the videos, and you know, respectfully, my history of success speaks for itself." In sum, Dallas testified that the Seely Group's agents would get "daily" internal training, plus periodic outside training, as well as access to lead-generation software. Michelle Bippus, who testified regarding the training at the Seely Group, characterized the training offered by the Seely Group as "basic real estate training."

2

By mid-2022, the Seely Group had "42 or 45 agents" and had been operating without an independent-contractor agreement for its agents, including Martin. "We were starting to notice that agents would come in, they would be with us for however many months or longer, they would basically get all this world-class training, and then, once they did, they would say, hey, thank you so much for turning me into a superstar, I'm going to go off on my own." After "instances where agents were leaving, stealing money, stealing clients, [and] stealing listings," Dallas testified that "we had to come up with an agreement" to "have a win-win for the partner agent and the company" and "protect[] the company from some of these instances."

The Seely Group developed an Independent Contractor Agreement (the Contract) that it required its agents to sign. Contract provisions relevant to this dispute include (1) a post-separation training fee which required that, within five business days of an agent's separation from the Seely Group, the agent was to pay a training fee amount that varied depending on the period of time that the agent had been contracted with the Seely Group: $2,500 for 90 days or less; $5,000 for 90 days or more but less than six months; and $7,500 for more than six months; (2) a $997 administrative fee provision that required that, upon the closing of any purchase or sale of real estate by a company client, the agent "should request" that the fee "be paid by the client and include it in the representation agreement," but if the client refuses to pay the fee, "it will be deducted from the Agent Share of the commission"; and (3) an exempt personal-transaction provision, which allowed agents to "act as their own representative in one purchase, sale, or lease of real estate each calendar year without paying a commission split to the [Seely Group]."

Dallas testified that when an agent was presented with the Contract, someone from the Seely Group's "Executive Team would actually sit down with them in person, and . . . go over every single line of the [Contract], read out loud, and then not only where it says in the [Contract]

3

but also tells them in person, hey, there's no pressure to sign this," and "if you want to sleep on this, if you want to have your attorney or any kind of counsel review it, you're more than welcome, but we want to really go above and beyond in communicating what our expectations and what this agreement says." But the Contract was not well received, and the Seely Group lost "a large majority of our sales force" over it.

When the Seely Group presented Martin with the Contract, his financial status was "tight," as he had just gone through "a big career change" and had been in real estate "just over six months." In the short time that Martin had been with the Seely Group, "there was absolute chaos at the agency," and "I essentially did the first 90 days by myself." And "I didn't receive any leads from [the Seely Group]." Martin expressed to Dallas his two main concerns about the Contract: the provisions regarding the training fee assessed to agents after separation and the administrative fee. Martin testified, "I don't think I've ever seen a company['s] training fees increase the longer you're there, especially because the training that I was promised wasn't anything near what was received." Dallas maintained that this amount increases over time because agents are "getting more and more high-level training. The longer an agent is with our organization, the higher they are trained up, the more we are spending to pour into them." As to the administrative fee, Martin testified that Dallas "started talking about these fees . . . a month approximately before the contract," and "there was a big stink in the office that we are charging clients more but actually not offering them more services."

When Martin raised these concerns to Dallas, Dallas told him, "you're one of my best guys and you've been loyal through everything I've been through, and I would never do that to you." As to the training fee specifically, Dallas said, "that's not something you're going to have to worry about, just sign it, it's more of a formality than anything else, it's not essentially for you."

4

As to the administrative fee, Dallas "reassured" Martin that "I trust you, you're a good agent, it's not something you're going to have to worry about." Martin testified that he believed Dallas. But Martin testified that Dallas also told him that "he would have to let me go" if Martin did not sign the Contract.

Martin signed the Contract. "I considered [Dallas] a friend and a mentor." "We went to church together," and "I trusted him." But he testified, "as a businessowner previously myself, I knew better." Still, even after Martin signed the contract, he maintains that Dallas told him that the administrative fee would not be taken out of commission "to me and a few others." And Shea Mworia, the Seely Group's director of operations from March 2022 through April 2023, testified that "multiple" agents, including Martin, were told "if you're working hard it won't affect you, as long as you're trying to obtain it"—"we weren't going to let it kill a deal." However, Dallas disagreed and testified that he never told Martin or other agents that he would not enforce terms in the Contract.

In October 2022, Martin's wife was seriously injured in an accident, and their family incurred unexpected medical bills over the next few months. In late December 2022 or early January 2023, Martin told Dallas about his family's difficult financial situation and asked if one of the properties he was working to close—a commercial lease at 500 E. 5th Street—could qualify as his annual exempt personal transaction. Martin testified that this property "was a lead that I already had," so he "didn't think it fell under the provisions of the [C]ontract." Dallas denied Martin's request. But he agreed to extend Martin an interest-free loan. Martin remembers it as Dallas's "suggestion" and that Dallas "offered an advance on future commissions" that "would be paid back over time" over multiple transactions.

5

On February 15, 2023, the Seely Group wired Martin $8,708.25. Martin had two deals—the 500 E. 5th Street lease, plus a residential sale on Knights Branch Drive—that had recently been completed, but his commission had not yet paid out. Given Martin's financial situation, Dallas testified that he agreed to advance Martin the money but "very purposely" labeled it as an "advance/loan" in the wire details.

Ten days later, Dallas sent Martin an email to which he attached the disbursement authorization form for 500 E. 5th street and a spreadsheet "of how the loan would be paid back" through the two property distributions. Dallas testified that he was trying to "overcommunicate in advance" "because of how hypersensitive [Martin] was" and to "get ahead of any unnecessary emotions because of a numbers miscommunication." However, in calculating the amount that Martin owed the Seely Group, Dallas accidentally applied a .5% transaction fee—a provision that applied to later independent-contractor agreements that the Seely Group issued, but not the one that Martin signed. Dallas also accidentally applied an administrative fee—which applied only to sales—to the lease deal. With these errors, the spreadsheet indicated that Martin would not receive any funds from the 500 E. 5th Street or Knights Branch Drive closings, as those funds would be paid back to the Seely Group, and that Martin still owed the Seely Group $3,697.39.[1] Dallas told Martin to "take a look and call me today to discuss what you want to do."

---

[1] The spreadsheet showed the following proposed breakdown:

| Address | Sales Price | Total GCI | Comp Split | Martin's Split | Transaction Fee | Admin Fee |
|---|---|---|---|---|---|---|
| 500 E. 5th St. | 323,967.60 | 9,719.03 | 4,261.31 | 2,840.88 | 1,619.84 | 997 |
| Knights Branch Dr. | 256,878 | 7,706.34 | 3,254.97 | 2,169.98 | 1,284.39 | 997 |

2/15 Wired:    $8,708.25
Martin Commissions:        $5,010.86

Martin was surprised when he saw the proposed breakdown, as he had not anticipated that the .5% transaction fee on both properties (totaling $2,904.23), $997 administrative fee on both properties (totaling $1,994), and Keller Williams "caps & royalty fees"[2] would be deducted from his 40% commission, leaving Martin with, as he characterized it, "approximately 5% of the total commission earned." Martin wrote back to ask about the assessed fees. "I wasn't supposed to be charged the transaction fee that was being assessed," and "I was trying to get in contact with [Dallas] about that." But "Dallas refused to speak with me." Dallas characterizes Martin's response to his email (which is not in the record) as going "off the deep end" and making "threats" to the company, like that he would "burn the company to the ground." Dallas testified that "I refused to sit down with him in person" or respond to Martin's requests to talk because of these "threats" and instead asked two members of his staff, Mworia and Jonathan Pylant, to meet with Martin.

At that meeting, Martin, Mworia, and Pylant agreed that Martin was not supposed to be assessed certain fees that Dallas included in the spreadsheet. However, the next day Pylant told Martin that "Dallas has instructed me to have you leave the office, it is effective immediately, and you are to return all your materials." Martin also testified that Pylant confirmed that he was "not supposed to be assessed these [administrative and transaction] fees." To maintain his ability to practice real estate, Martin transferred his license to a new broker the same day.

Martin continued to ask Dallas if he would meet with him over the following days, but Dallas never responded. On March 7, Martin wrote Dallas and Amy to express his

---

Delta owed to the Seely Group:        $3,697.39

[2] This amount, which is included in the Disbursement Authorization forms for each property, is $1,010.78 for 500 E. 5th Street and $838 for Knights Branch Drive.

disappointment over the dispute and "in hopes that we can put this behind us in a peaceful manner." He sought "clarification of the contract status concerning fees" and listed five clients to ask "how these will be assessed." He said that "I need a written notice from you . . . acknowledging and agreeing to release me," and "I will pay you the balance of what I owe you from the advance." Martin emphasized he did not "wish to escalate this any further." But he noted that if he did not hear from Dallas by the end of the day, he "will assume you will be taking legal action and we will do what is necessar[y] for our family." Martin also sent a letter to Keller Williams' corporate office detailing the dispute, contending that "I consider my contract with your company (The Seely Group) void," and raising "a possibility of RESPA [Real Estate Settlement Procedures Act] violations regarding fees charged to clients."

On March 14, 2023, the Seely Group sued Martin for breaching the Contract and sought repayment of the advance, payment of the post-termination fees, including the $7,500 training fee, and injunctive relief based on the Contract's noncompete provision. After a hearing, the Seely Group secured a temporary injunction prohibiting Martin from, among other activities, conducting residential real-estate work in Austin, Lago Vista, Georgetown, Bastrop, and Buda.

Martin represented himself for much of this lawsuit and filed his pleadings, which asserted counterclaims against the Seely Group, as well as Dallas and Amy individually, pro se. Though Martin eventually secured counsel and was represented at trial, he went to trial on his first amended answer and counterclaim, which he filed pro se. At trial, the Seely Group, Dallas, and Amy proceeded on their claims for breach of contract, money had and received, and attorney's fees. Martin proceeded on his claim for breach of contract based on the Seely Group's failure to provide "specialized training," denial of his request for a personal transaction, and withholding of

8

amounts owed to him; fraudulent inducement to enter the Contract; violations of the Texas Real Estate Act; and attorney's fees under Chapter 38 of the Civil Practice and Remedies Code.

Following a two-day bench trial, the trial court rendered judgment that awarded Martin $20,714.17, as well as court costs and fees, assessed against Dallas and the Seely Group. The judgment did not specify which of Martin's claims it granted relief on, and it ordered that the Seely Group take nothing from Martin. It left open a future award of attorney's fees to Martin.

The Seely Group, Dallas, and Amy (collectively, appellants) requested findings of fact, and after a hearing on Martin's request for attorney's fees—which the trial court ultimately denied—the trial court issued findings of fact and conclusions of law, including that:

- Martin and the Seely Group are the parties to the Contract.

- The $8,708.25 wired to Martin was "an advance on future commissions from the sale at 500 East 5th Street," so the Seely Group "is not entitled to repayment."

- Martin was not obligated to pay transaction fees.

- Dallas, on the Seely Group's behalf, "improperly deduc[t]ed from Martin's commission" $2,904.23 in transaction fees and $1,994 in administrative fees.

- Martin's property at 500 E. 5th Street did not involve a "company originated client because Martin's relationship arose with the client prior to being under" the Contract and the client was not referred to Martin by the Seely Group. Thus, the Seely Group was not entitled to 60% commission, the contract-to-close fee, or the administrative fee on that deal.

- The Seely Group was not entitled to an offset of funds advanced to Martin because it did not properly plead it as an affirmative defense.

- The corporate veil was pierced, and Dallas is liable for breach of the Contract because the Seely Group is Dallas's alter ego, Dallas used the Seely Group "to perpetuate actual fraud by intentionally making material misrepresentations to Martin regarding the assessment of fees against Martin's commissions," and "the representations were made for Dallas Seely's direct personal benefit."

9

- The Contract's attorney's fees provision is unconscionable because it allows the Seely Group to recover an unlimited amount of attorney's fees "but completely bars Martin's recovery of the same."

Appellants perfected this appeal.

## STANDARD OF REVIEW

In an appeal from a bench trial, we review a trial court's legal conclusions de novo, affirming the judgment on any legal theory that finds support in the evidence. *Hegar v. El Paso Elec. Co.*, 629 S.W.3d 518, 527 (Tex. App.—Austin 2021, pet. denied) (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)). Unchallenged findings of fact are binding on the appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding. *Id.* (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986)). When challenged, we review the trial court's findings for legal and factual sufficiency. *Iliff v. Iliff*, 339 S.W.3d 126, 134 (Tex. App.—Austin 2009), *aff'd*, 339 S.W.3d 74 (Tex. 2011). An attack on the sufficiency of the evidence must generally be directed at specific findings of fact rather than the judgment as a whole. *Crowder v. Sanger*, No. 03-21-00291-CV, 2023 WL 4631501, at *9 (Tex. App.—Austin June 30, 2023, pet. granted, judgm't vacated w.r.m.) (mem. op.). It is the appellant's duty to challenge the trial court's express and implied findings. *Long v. Long*, 234 S.W.3d 34, 42 (Tex. App.—El Paso 2007, pet. denied).

When an appellant challenges the legal sufficiency of the evidence supporting an adverse finding, appellate courts consider only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding and disregard all evidence and inferences to the contrary. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994). When the appellant challenges an issue on which it did not have the burden of proof at trial, it must demonstrate on

10

appeal that there is no evidence to support the trial court's adverse findings. *Affordable Power, L.P. v. Buckeye Ventures, Inc.*, 347 S.W.3d 825, 830 (Tex. App.—Dallas 2011, no pet.) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)). And when the appellant challenges the legal sufficiency of an adverse finding on an issue on which it had the burden of proof at trial, it must demonstrate on appeal that the evidence conclusively established, as a matter of law, all vital facts in support of the issue. *New York Party Shuttle, LLC v. Bilello*, 414 S.W.3d 206, 211 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). We consider the evidence in the light most favorable to the verdict and indulge all reasonable inferences in its support. *Id.* (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)).

When an appellant challenges the factual sufficiency of the evidence, we consider all the evidence and set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). The trial court, as trier of fact and the sole judge of the credibility of the witnesses, is free to draw its own deductions from all the evidence and is not bound by the testimony of any witness. *Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co.*, 66 S.W.3d 340, 347 (Tex. App.—Tyler 2001, pet. denied); *see Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004). The trial court's findings are binding unless they are supported by no evidence or so against the great weight of the evidence as to be manifestly unjust. *Sieber & Calicutt*, 66 S.W.3d at 347.

## DISCUSSION

Appellants raise eight issues on appeal, arguing that the trial court erred (1-2) by finding fraud against Dallas and the Seely Group (a) despite the Contract's disclaimer-of-reliance provision and (b) given that the alleged misrepresentations contradicted the Contract's language;

11

(3) by piercing the Seely Group's corporate veil; (4) by finding the Contract's attorney fee shifting provision unconscionable; (5) by finding that the Seely Group breached the Contract; (6) by declining to apply an offset for the amount they contend Martin owed the Seely Group; (7) in calculating damages; and (8) in awarding a take-nothing judgment against the Seely Group. We address the issues involving Martin's claims in the trial court first (issues 1, 2, 3, and 5), then address the issues involving the Seely Group's affirmative defense and claims (issues 4, 6, and 8), and last address damages (issue 7).

**Martin's claims**

*Breach of contract*

In their fifth issue, appellants contend that the trial court erred by awarding damages to Martin under a breach-of-contract theory. Appellants argue that the Seely Group did not breach the Contract because it did not "charge any fees" to Martin; rather, it withheld from commissions payable to Martin the $7,500 training fee that Martin owed upon his separation from the Seely Group (but that Martin had not paid), and Martin's balance on the loan exceeded his commissions. We consider appellants' offset and damages calculation arguments below and decide here whether appellants have established that insufficient evidence supports the trial court's judgment in Martin's favor on his breach-of-contract claim.

"Breach of contract requires pleading and proof that (1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3) the defendant breached the contract by failing to perform or tender performance as contractually required; and (4) the plaintiff sustained damages due to the breach." *Plan B Holdings, LLC v. RSLLP*, 681 S.W.3d 443, 452–53 (Tex. App.—Austin 2023, no pet.) (quoting *Pathfinder Oil & Gas, Inc.*

12

*v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019)).  On appeal, appellants focus on the third requirement—whether the Seely Group breached by failing to deliver to Martin what he was owed under the Contract.

Following the trial court's judgment, appellants requested findings of fact and conclusions of law.  Appellants specifically requested findings on Martin's breach-of-contract claim regarding the parties to the Contract, whether Martin paid fees assessed by the Seely Group, and whether the 500 E. 5th Street property qualified as an exempt personal transaction under the Contract.  Relevant to Martin's claim for breach of contract, the trial court found:

> The parties to the Contract are Martin and the Seely Group.
>
> Martin "substantially performed all of his obligations" under the Contract.
>
> "Fees are deemed paid if deducted from Martin's commission."
>
> "There was no contractual obligation for Martin to pay Transaction Fees."
>
> Dallas[3] and the Seely Group breached the Contract…
>
>> by assessing $2,904.23 worth of transaction fees against Martin's commissions.
>>
>> by assessing $1,994.00 in administrative fees against Martin's commissions.
>>
>> "by wrongfully withholding $7,110.69 of Martin's commissions."
>>
>> "by wrongfully collecting commissions totaling $8,705.25 from the 500 E. 5th St. transaction."
>
> Because Martin's relationship with the 500 E. 5th Street client began before he signed the Contract and the client did not sign a representation agreement with Martin, that property "is not covered under the [Contract]" under the Contract's terms and thus "[the Seely Group] was not entitled to 60% of the commission from the sale of the property, Contract to Close Fee, or Administrative Fee."[4]

---

[3] We address appellants' issue regarding piercing the corporate veil below.

[4] The order further stated that the trial court reached this finding because (1) "the client did not sign a representation agreement or listing or otherwise agree[] to utilize Martin's services

13

The Seely Group "has not paid Martin any commission since February 15, 2023."

"Martin is the prevailing party under the Agreement . . . ."

Thus, the trial court found that, after Martin substantially performed his obligations under the Contract, the Seely Group breached the Contract when it assessed fees from Martin's commissions contrary to the Contract's terms and when it collected commission, costs, and fees on the 500 E. 5th Street property. Sufficient evidence in the record supports these findings as detailed above, including the undisputed evidence that the Seely Group has not paid Martin anything for the closing on Knights Branch Drive.

Further, we will uphold the trial court's legal conclusion if the judgment can be sustained on any theory supported by the evidence. *City of Houston v. Cotton*, 171 S.W.3d 541, 546 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). Appellants did not request a finding as to the Seely Group's breach of the Contract regarding its promise to "provide[] specialized training, support, technology, lead-generation, and value-added services to its contract Agents" or related to its assertion that it properly withheld $7,500 from commission payable to Martin to account for the post-separation training fee it contends Martin owed but did not pay within five business days of his separation—allegations Martin raised in support of his breach-of-contract claim. In a bench trial, when the complaining party requests and the court files findings of fact, omitted findings can be presumed only when (1) an element of the ground of recovery was included in the findings of fact; (2) the omitted element has not been properly requested; and (3) the

in the purchase or sale of real estate" and thus is not a "Company Client" under the Contract; and (2) "Martin's relationship arose with the client prior to being under contract with [the Seely Group] and the client was not referred to Martin by and through [the Seely Group]" such that the client is not a "Company-Originated Client" under the Contract. Appellants have not challenged these findings on appeal.

omitted finding is supported by the evidence. Tex. R. Civ. P. 299; *American Nat. Ins. v. Paul*, 927 S.W.2d 239, 245 (Tex. App.—Austin 1996, writ denied). While appellants requested and the trial court filed findings as to other elements of Martin's breach-of-contract claims (e.g., the parties to the Contract, Martin's performance, damages), appellants did not request findings (or amended or additional findings) regarding Martin's allegations that the Seely Group breached the Contract because it "failed to provide 'specialized training' . . . per the terms of the [Contract]."

Sufficient evidence in the record supports the trial court's implied finding that the Seely Group did not provide the training for which it claims it assessed the post-termination $7,500 training fee. *See New York Party Shuttle*, 414 S.W.3d at 211. For example, Martin testified that the training he received "was nothing," "the training that I was promised wasn't anything near what was received," "there was absolute chaos at the agency" regarding training, and that he "didn't receive any leads" from the Seely Group. Bippus also testified that the training that was made available to agents at the Seely Group was "basic sales training." Thus, the final judgment can also be affirmed by sufficient evidence in the record that the Seely Group breached the Contract by failing to deliver the specialized training as it promised.

Under the requisite standard of review, appellants failed to carry their burden to show that no evidence supports the trial court's determination that it breached the Contract. *See Affordable Power*, 347 S.W.3d at 830. We overrule appellants' fifth issue.

Having determined that the judgment in Martin's favor can be affirmed on a breach-of-contract theory, we need not consider appellants' challenge to the trial court's "fraud findings"[5] (their first and second issues), which appear to challenge the trial court's judgment

---

[5] The trial court's only finding involving fraud was that "Dallas Seely used [the Seely Group] to perpetuate actual fraud by intentionally making material misrepresentations to Martin

15

under a theory of fraudulent inducement. *See* Tex. R. App. P. 47.1; *APMD Holdings, Inc. v. Praesidium Med. Prof'l Liab. Ins.*, 555 S.W.3d 697, 713 n.7 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ("Because [appellee's] theories of fraud and breach of fiduciary duty would not afford it any greater relief than its breach of contract theory, which is sufficient to support the trial court's judgment, we need not address [appellant's] . . . issues concerning the fraud and breach of fiduciary duty claims.").

*Veil piercing*

Appellants argue that the trial court erred by piercing the Seely Group's corporate veil and holding Dallas personally liable for the judgment because Martin did not plead any theory of veil piercing and the issue was not tried by consent. And appellants contend that even if the issue was properly pleaded or tried by consent, there is no evidence to support the trial court's findings. Those findings include that (1) the Seely Group "is the alter ego of Dallas Seely," (2) Dallas used the Seely Group "to perpetuate actual fraud by intentionally making material misrepresentations to Martin regarding the assessment of fees against Martin's commissions," and (3) "the representations were made for Dallas Seely's direct personal benefit."

Generally, the owner of a corporation is not liable for the corporation's contractual obligations. *See* Tex. Bus. Orgs. Code § 21.223(a)(2); *Dodd v. Savino*, 426 S.W.3d 275, 290 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also* Tex. Bus. Orgs. Code § 101.002(a) ("Subject to Section 101.114, Section[ ] 21.223 . . . appl[ies] to a limited liability company and the company's members, owners, assignees, affiliates, and subscribers."). However, a statutory

---

regarding the assessment of fees against Martin's commissions," which relate to its veil-piercing conclusion.

16

exception allows the corporate veil to be pierced "if the obligee demonstrates that the . . . owner . . . caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the . . . owner . . . ." Tex. Bus. Orgs. Code § 21.223(b). Here, the trial court appeared to find that the corporate veil had been pierced under an alter-ego theory. *See Dodd*, 426 S.W.3d at 290 (citing *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986)); *Plan B Holdings*, 681 S.W.3d at 461. To prevail on an alter-ego theory of veil piercing, "the plaintiff must demonstrate (1) that the entity on which it seeks to impose liability is the alter ego of the debtor, and (2) that the corporate fiction was used for an illegitimate purpose, that is, to perpetrate an actual fraud on the plaintiff for the defendant's direct personal benefit." *Plan B Holdings*, 681 S.W.3d at 461 (quoting *U.S. KingKing, LLC v. Precision Energy Servs., Inc.*, 555 S.W.3d 200, 213–14 (Tex. App.—Houston [1st Dist.] 2018, no pet.)).

Texas follows a "fair notice" standard for pleading, which considers whether an opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000). Issues, including alter ego, that are not raised by the pleadings may be tried by the express or implied consent of the parties. *See* Tex. R. Civ. P. 67; *Richard Nugent & CAO, Inc. v. Estate of Ellickson*, 543 S.W.3d 243, 264 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("Alter ego must be specifically pleaded or it is waived, unless tried by consent."). Trial by consent applies in "exceptional cases" where it appears from the record that an issue was actually tried, although not pleaded. *Armstrong v. Armstrong*, 570 S.W.3d 783, 789 (Tex. App.—El Paso 2018, pet. denied).

It is undisputed that Martin did not plead veil piercing, but Martin argues that the parties impliedly tried the issue by consent. He points to evidence admitted regarding "Dallas

17

operating as CEO," Dallas's "personal involvement in disputed transactions," Dallas's "arbitrary conduct in acting on behalf of [the Seely Group]," and Dallas's "representations that he could assess fees however he wanted" because he was "the boss and owner."

On this record, we cannot conclude that this is an "exceptional case" in which the parties tried the issue of veil piercing by consent. While the record may include some evidence potentially relevant to the issue of alter ego, there is no evidence that the issue of an alter-ego theory of veil piercing was tried. *See id.*; *Johnston v. McKinney Am., Inc.,* 9 S.W.3d 271, 281 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). Further, even if the parties had tried the issue by consent, there is no evidence in the record that Dallas used the Seely Group to perpetrate an actual fraud for his direct personal benefit.[6] Evidence at trial showed that Dallas was the CEO of the Seely Group, and as part of that role, he developed the Contract, which he and his executive team rolled out to agents, and was involved in decisions regarding commissions and payouts both under and outside of the Contract. But no evidence, including the evidence that Martin points to in his appellate brief, raises a reasonable inference to support the finding that Dallas received a "direct personal benefit" from the purported actual fraud that Martin alleges occurred. *See* Tex. Bus. Orgs. Code § 21.223(b); *Shook v. Walden,* 368 S.W.3d 604, 622 (Tex. App.—Austin 2012, pet. denied). In cases in which the "direct personal benefit" showing has been met, evidence showed that funds derived from the corporation's allegedly fraudulent conduct were diverted to the individual defendant. *See Hong v. Havey,* 551 S.W.3d 875, 885–886 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (collecting cases). There was no such evidence of a direct personal

---

[6] In their request for findings of fact and conclusions of law, appellants specifically requested that the trial court explain: "How Dallas (a non-party to the [Contract]) . . . is liable for breach of an agreement to which he is not a party[.]"

benefit to Dallas resulting from actual fraud in connection to the "material misrepresentations" that Martin alleges Dallas made "regarding the assessment of fees against Martin's commissions," as the trial court found. *See id.*; Tex. Bus. Orgs. Code § 21.223(b); *cf. Hurwitz v. SynergyMed Corp. Wellness, LLC*, No. 03-24-00673-CV, 2025 WL 3165386, at *8–9 (Tex. App.—Austin Nov. 13, 2025, no pet. h.) (mem. op.) (finding sufficient evidence of appellants' "direct personal benefit" when record contained evidence that individual defendant used corporation "as his 'personal piggy bank,'" including making down payment on real property for his personal benefit).

Because the record does not indicate that corporate veil piercing was pled or tried by consent, and because no evidence supports the trial court's findings piercing the Seely Group's corporate veil by an alter-ego theory, we agree with appellants that Dallas cannot be held personally liable for the Seely Group's breach of the Contract, to which he is not a party. We sustain appellants' third issue.

**Appellants' claims**

*Breach of contract*

In their eighth issue, appellants argue that the trial court erred by rendering a take-nothing judgment against the Seely Group. Specifically, appellants contend that they proved that Martin breached "both the [Contract] and the loan agreement," pointing to Martin's failure to pay the $7,500 post-separation training fee and the existing loan balance.

As to the loan balance, appellants argue that Martin breached "the loan agreement" when he did not repay "the loan balance." While undisputed evidence at trial established that the Seely Group advanced $8,708.25 to Martin, appellants did not allege in their pleadings or attempt to establish at trial the existence of a "loan agreement" separate from the Contract, nor did

19

appellants allege that the Contract itself served as the basis for Martin's obligation to repay the advance. *See Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000); *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 142 (Tex. App.—Dallas 2012, no pet.). Evidence at trial did not conclusively establish as a matter of law all vital facts in support of the Seely Group's breach-of-contract claim on the advance. *See New York Party Shuttle*, 414 S.W.3d at 211. The Seely Group therefore did not conclusively establish as a matter of law that Martin breached a contract by failing to repay the amount the Seely Group claims that it is still owed. *See id.*

As to the post-separation training fee, we determined above that sufficient evidence in the record supports an implied finding that the Seely Group breached the Contract by failing to deliver the specialized training as promised. "In general, '[a] fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform.'" *Stapel, LP v. Scott & White Mem'l Hosp.*, No. 03-16-00750-CV, 2018 WL 386675, at *7 (Tex. App.—Austin Jan. 3, 2018, pet. denied) (mem. op.) (quoting *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994)). Thus, the trial court's judgment against the Seely Group on its breach-of-contract claim can be upheld on the ground that Martin was not required to pay the post-separation training fee after the Seely Group's breach of the Contract and thus the Seely Group improperly withheld commission it owed Martin to account for this fee.

We overrule appellants' eighth issue. Because we affirm the trial court's judgment on the Seely Group's breach-of-contract claim, we do not need to reach appellants' fourth issue, which challenges the trial court's conclusion that the prevailing-party attorney's fees provision in the Contract is "unconscionable." *See* Tex. R. App. P. 47.1.

20

*Offset*

Appellants contend that the trial court erred in not applying an offset against Martin's damages for the Seely Group's "advance/loan" of $8,708.25. The right to an offset, or a reimbursement against damages, is an affirmative defense, which must be pleaded and proved by the party asserting it. *See Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931, 936 (Tex. 1980). The party asserting its entitlement to an offset has the burden of pleading the affirmative defense and proving the facts necessary to support it. *Id.*; *see* Tex. R. Civ. P. 94. But, as with the unpleaded claim of corporate-veil piercing discussed above, an unpleaded affirmative defense may be deemed to have been tried by consent when evidence on the issue is developed at trial under circumstances that indicate that both parties understood that the issue was in the case, and the other party does not object. *Tenet Health Sys. Hosps. Dallas, Inc. v. North Tex. Hosp. Physicians Grp., P.A.*, 438 S.W.3d 190, 204 (Tex. App.—Dallas 2014, no pet.).

Appellants fault the trial court for not granting an offset, but the Seely Group's pleadings do not assert it. *See Geis v. Colina Del Rio, LP*, 362 S.W.3d 100, 113 (Tex. App.—San Antonio 2011, pet. denied) ("Because this offset was not requested in [appellant's] pleadings, this complaint is not preserved for appellate review."). Appellants attempt to rely on the fact that Martin's pleadings asserted the affirmative defense of offset, but that improperly shifts the burden of responsive pleadings. *See* Tex. R. Civ. P. 94. Likewise, though the Seely Group points to evidence at trial of "loan balancing offsetting Martin's claim for commissions," this evidence was also relevant to the pleaded issue of Martin's offset affirmative defense and thus does not indicate the parties' clear intent to try the unpleaded issue of the Seely Group's offset claim. *See Gharbi v. Hemmasi*, No. 03-07-00036-CV, 2015 WL 4746682, at *5 (Tex. App.—Austin Aug. 6, 2015, no pet.) (mem. op.) (citing *Case Corp. v. Hi-Class Bus. Sys. Of Am., Inc.*, 184 S.W.3d 760, 771

21

(Tex. App.—Dallas 2005, pet. denied)). We cannot say that this is one of the "exceptional cases" where it appears from the record that the Seely Group's offset issue was actually tried, although not pleaded. *See Armstrong*, 570 S.W.3d at 789.

We overrule appellants' sixth issue.

## Damages

Finally, appellants contend that there is not legally or factually sufficient evidence to support the trial court's award to Martin of $20,714.17 in damages. Appellants argue that, notwithstanding an offset from the loan and the post-separation training fee, the most that the Seely Group would owe Martin under the Contract is 40% commission on the 500 E. 5th Street and Knights Branch Drive properties, less Keller Williams' broker fees, for a total of $5,261.91 ($2,876.83 on 500 E. 5th St. and $2,385.08 on Knights Branch Drive).

The trial court found that the Seely Group wrongfully (1) "assess[ed]" $2,904.23 worth of transaction fees and $1,994.00 in administrative fees against Martin's commissions; (2) "with[eld]" $7,110.69 of Martin's commissions; and (3) "collect[ed]" commissions "totaling $8,705.25[7] from the 500 E. 5th St. transaction." Appellants suggest that the trial court appeared to reach the total damages sum by adding these amounts, which it pulled from the disbursement authorization forms for the 500 E. 5th Street commercial lease and the Knights Branch Drive residential sale, as well as the spreadsheet that Dallas attached in his email to Martin proposing his repayment of the loan that led to the parties' dispute.

---

[7] This figure appears to include a typo, as this amount is otherwise consistently referred to as $8,708.25.

The first category—$2,904.23 in transaction fees and $1,994.00 in administrative fees (totaling $4,898.23) "assess[ed]" against Martin's commissions—appears to refer to the total proposed transaction and administrative fees noted in Dallas's spreadsheet emailed to Martin discussing his proposal for how Martin would repay the loan. However, it is undisputed that this spreadsheet did not represent the Seely Group's official accounting of Martin's commissions; instead, it was Dallas's estimate of how he proposed Martin would repay the loan through deductions from his commissions on the 500 E. 5th Street and Knights Branch Drive properties. That is, the spreadsheet restated amounts pulled from the disbursement authorization forms for both properties and did not represent additional sums that had been deducted from money owed to Martin. And the damages calculations for the 500 E. 5th Street and Knights Branch Drive properties are already accounted for in the trial court's damages award (discussed below). Adding these amounts to Martin's damages calculation provided for duplicate recovery of $4,898.23 in transaction and administrative fees that is not substantiated by any evidence.

The second category—$7,110.69 "with[eld]" from Martin's commissions— appears to refer to the Knights Branch Drive property, as there is no evidence of any other transaction for which Martin is owed a commission (besides 500 E. 5th St., discussed below). It is undisputed that Martin never received any commission from the Knights Branch Drive sale. But it is also unclear from the record where the $7,110.69 figure comes from, as no exhibits or testimony at trial reflect or total that amount, nor have appellants or Martin pointed to any support in the record for that amount. Thus, we review the record to determine whether some of this amount is supported by sufficient evidence.

The disbursement authorization form for Knights Branch Drive indicates that the gross commission income—which, as Martin testified, is the amount from which the 60/40

23

commission split is calculated—is $8,057.70. Forty percent of that amount, or Martin's commission determined by the Contract, is $3,223.08. The Keller Williams brokerage fee, which the Contract states is to be subtracted from Martin's commission, is $838. Martin's commission minus the brokerage fee is $2,385.08. And the trial court found that the Seely Group "improperly deducted" transaction and administrative fees from Martin's commission, so no transaction fee or $997 administrative fee would be further deducted. This amount of $2,385.08 is supported by testimony by Dallas and Martin, as well as the disbursement authorization form for the property admitted as an exhibit at trial. And the Seely Group agrees that $2,385.08 is "the most" commission that Martin could have received for the Knights Branch Drive property. Thus, while the $7,110.69 figure is not supported by the record, the trial court's damages finding is partially supported by legally sufficient evidence of $2,385.08 that the Seely Group withheld from Martin's commissions. This finding also is not so contrary to the evidence as to be clearly wrong and unjust, so it is partially supported by factually sufficient evidence.

Finally, the third category—$8,708.25 in "collect[ed]" commissions—refers to the 500 E. 5th St. transaction. The trial court concluded that the Seely Group was not entitled to a 60% commission or any of its fees because that property was not covered by the Contract. The trial court also concluded that "the funds issued to Martin were an advance for commission from the sale [sic] of 500 East 5th Street which has been accounted for in the Judgment." The disbursement authorization form for 500 E. 5th Street indicates that the net commission (i.e., the amount from the brokerage to the agency from which Martin's commission would be calculated), minus the Keller Williams brokerage fee, is $8,708.25, or the total amount that the Seely Group advanced to Martin. Thus, while sufficient evidence supports the trial court's determination that the 500 E. 5th Street property was not covered by the Contract and therefore the Seely Group was not entitled to

24

any commission or fees from that deal (i.e., that it "wrongfully collect[ed] commissions" on this property), there is no evidence that supports an additional award of $8,708.25 in damages from the 500 E. 5th Street property to Martin. In other words, because Martin already received the full amount of commission that he was entitled to for 500 E. 5th St. when he received the advance, he is not entitled to a double recovery of that amount in the judgment.

In sum, "although the evidence is legally sufficient to support a finding of some amount, it is legally insufficient to support the entire amount" the trial court awarded. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. National Dev. & Rsch. Corp.*, 299 S.W.3d 106, 123 (Tex. 2009). "[W]hen there is some evidence of damages, but not enough to support the full amount, it is inappropriate to render judgment." *Id.* at 124. "In such a case, 'we may either suggest a remittitur or remand to the trial court for a new trial.'" *Kazmi v. Kazmi*, 693 S.W.3d 556, 581 (Tex. App.—Austin 2023, pet. denied) (quoting *DeNucci v. Matthews*, 463 S.W.3d 200, 215 (Tex. App.—Austin 2015, no pet.)). Accordingly, we suggest a remittitur of $18,329.09, the difference between the amount awarded, $20,714.17, and the amount supported by sufficient evidence, $2,385.08. *See* Tex. R. App. P. 46.3 (providing that "court of appeals may suggest a remittitur"). We reform this portion of the trial court's judgment conditioned on Martin filing this remittitur within 30 days of the date of this opinion. *See id.* ("If the remittitur is timely filed, the court must reform and affirm the trial court's judgment in accordance with the remittitur. If the remittitur is not timely filed, the court must reverse the trial court's judgment.").[8]

---

[8] Otherwise, we will reverse this portion of the judgment and remand the cause to the trial court for a new trial. *See* Tex. R. App. P. 46.3 ("If the remittitur is not timely filed, the court must reverse the trial court's judgment."). Because an appellate court "may not order a separate trial solely on unliquidated damages if liability is contested," *id.* R. 44.1(b), and because the Seely Group has contested liability, remand of the issues of liability and the unliquidated damages will be necessary, *see Minnesota Min. & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 740 (Tex. 1997).

We sustain appellants' seventh issue.

## CONCLUSION

We reverse the trial court's judgment to the extent that it holds Dallas personally liable. We reform the trial court's judgment to reflect an award of $2,385.08 in damages, and as reformed, we otherwise affirm the judgment conditioned on Martin filing the remittitur within 30 days of the date of this opinion.

_____

Rosa Lopez Theofanis, Justice

Before Justices Triana, Kelly, and Theofanis

Reversed and Rendered in Part; Reformed and, as Reformed, Affirmed in Part

Filed: July 10, 2026

---

*E.g., Golden Corral Corp. v. Noble Austin Apartments L.L.C.*, No. 03-19-00463-CV, 2021 WL 2878565, at *11 n.15 (Tex. App.—Austin July 9, 2021, no pet.) (mem. op.).